TROUTMAN PEPPER HAMILTON SANDERS LLP
Justin D. Balser, Bar No. 027850
justin.balser@troutman.com
5 Park Plaza
Suite 1400
Irvine, CA 92614
Telephone: 949.622.2700
Facsimile: 949.622.2739

TROUTMAN PEPPER HAMILTON SANDERS LLP
Ben Lewis Wagner, Cal. Bar No. 243594 (pro hac vice forthcoming)
ben.wagner@troutman.com
11682 El Camino Real
Suite 400
San Diego, CA 92130-2092
Telephone: 858.509.6000
Facsimile: 858.509.6040

Attorneys for Plaintiff
SLEEP NUMBER CORPORATION

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Sleep Number Corporation,<br><br>                Plaintiff,<br><br>  vs.<br><br>Anonymous Ultimate Licensee Of COMFORT.COM; WWW.COMFORT.COM<br><br>                Defendants. | Case No. 2:23-cv-00377-MTL<br><br>**PLAINTIFF SLEEP NUMBER CORPORATION'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND OSC RE PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES** |

146297617v4

# APPLICATION

Plaintiff, SLEEP NUMBER CORPORATION, ("SLEEP NUMBER" or "Plaintiff") hereby applies *ex parte* for a Temporary Restraining Order and Order to Show Cause Why a Preliminary Injunction Should Not Issue, pursuant to Fed. R. Civ. P. 65. Plaintiff seeks provisional transfer of the domain name COMFORT.COM (the "Stolen Domain") pending Plaintiff's lawsuit against the Anonymous Ultimate Licensee of the Stolen Domain, and a prohibition against any other transfers other than to Plaintiff.

SLEEP NUMBER, owner of the COMFORT.COM website, faces immediate and irreparable harm due to: (1) cybersquatting by the Anonymous Ultimate Licensee of the domain COMFORT.COM ("Defendant" or "ULTIMATE LICENSEE"), with the domain currently being held through a privacy protect organization, Domains by Proxy, LLC ("DOMAINS BY PROXY"), with Defendant having stolen and improperly used the COMFORT.COM domain name, (2) violations of the federal CFAA, and (3) conversion.

Thus, SLEEP NUMBER seeks a preliminary injunction requiring the provisional transfer of the domain name COMFORT.COM from Defendant to SLEEP NUMBER, to stop the immense irreparable injury from continuing. As outlined more fully below, and set out in the attorney Declaration of Ben L. Wagner, SLEEP NUMBER must move *ex parte* because there is a substantial risk notice will obstruct availability of meaningful relief if given prior to a TRO.

Plaintiff pursued all informal channels through the registrar and privacy-protect proxy to immediately obtain return of the stolen domain. Plaintiff seeks recovery through final resolution, but also is in immediate need of a temporary restraining order requiring the cybersquatted and stolen domain name to be provisionally transferred back to Plaintiff to prevent further irreparable harm pending the ultimate resolution of this dispute, including a devastating interference with Plaintiff's backend operations and day-to-day operations, and a pending listing indicating the stolen domain may eminently be transferred to yet another third party at any moment for a mere $495,000. Thus, a TRO is sought.

-2-

146297617v4

This application is based on:

1. The accompanying Memorandum of Points and Authorities;
2. Verified Complaint
3. Declaration of Ben L. Wagner in Support of SLEEP NUMBER's Motion for Preliminary Injunction;
4. Proposed Order Granting SLEEP NUMBER's Application for Preliminary Injunction; and
5. All other materials presented by Plaintiff on or before the hearing on this application for Preliminary Injunction.

**MEMORANDUM**

Plaintiff Sleep Number Corporation ("SLEEP NUMBER") moves for a temporary restraining order ordering a provisional transfer of the domain name, preliminarily enjoining Defendant, who has stolen the valuable COMFORT.COM domain name (the "Stolen Domain"), has moved the hosting server to Germany, and is currently attempting to transfer the domain through a GoDaddy Auction, a domain that also hosts SLEEP NUMBER's backend services and the company's critical day-to-day functioning that are being irreparably harmed each additional day of Defendant's theft and cybersquatting.

As explained in the Verified Complaint, SLEEP NUMBER has been the registrant of COMFORT.COM since 1995. SLEEP NUMBER is one of the most successful adjustable smart bed companies, with a $1 billion market cap, nearly $2 billion in annual sales, and around 5,000 employees. Given SLEEP NUMBER's predecessor name was SLEEP COMFORT, and its operation of the popular COMFORT.COM domain for over 20 years reached countless millions of consumers, the domain name COMFORT.COM is an incredibly strong brand in and of itself, and its goodwill is substantially associated with the goodwill of SLEEP NUMBER's many famous existing and legacy marks.

And the strength of the domain itself makes it incredibly valuable. Similar domains fetch high prices – like the sales in the past few years of domains like CarInsurance.com for $50 million, PrivateJet.com for $30 million, Connect.com for $10 million, and Help.com for $3 million. *See* sedo.com; godaddy.com; cloudanalogy.com; dnjournal.com.

On Tuesday of this week, February 28, SLEEP NUMBER's systems operating through COMFORT.COM stopped working. SLEEP NUMBER immediately investigated and discovered that by early 2022, an unknown third party had without authorization hijacked its Network Solutions account for the COMFORT.COM domain, transferred the domain name registration to itself, and hid its identity and details by engaging GODADDY and DOMAINS BY PROXY to act as Registrar and the listed privacy-protected Registrant (which allows the ultimate licensee of the domain to remain masked) Defendant "ULTIMATE LICENSEE".

1    Stealing and maintaining a domain name that itself has achieved trademark status
2 and is interlinked with Plaintiff's other related trademarks constitutes cybersquatting in
3 violation of the federal Lanham Act, a violation of the federal Computer Fraud and Abuse
4 Act, and the state-law claim of conversion.
5    An emergency transfer order handing the domain registration back to SLEEP
6 NUMBER on a provisional basis is critical to stop further irreparable injury.  The result so
7 far has been devastating, and goes far beyond the unlawful click-through ad revenue this
8 hijacker has been siphoning off of the domain.  It goes beyond even the more egregious
9 potential $495,000 that Defendant ULTIMATE LICENSEE hopes to get by an eminent
10 attempt to auction off the domain name at an underpriced amount set on the hopes of a
11 quick sale, a sale that would also cement the irreparable harm.  These are egregious
12 enough on their own to warrant injunctive relief.
13    But the clencher was Defendant's Tuesday switch of the domain to a German server
14 which, in doing so, cut-off all the backend daily business activities for which SLEEP
15 NUMBER uses COMFORT.COM.  This debilitating blow interferes with or stops
16 customer communications, remote employee access, delivery scheduling, and more – all of
17 which significantly harm Plaintiff's (1) $2 billion/year business **and** (2) its customer base
18 that relies on Plaintiff's smart bed products for a healthy sleep.
19    A TRO provisionally transferring the domain and barring any other transfers by
20 Defendant, its agents or related parties is absolutely warranted.

21    **A.    Legal Standard for TRO and OSC re Preliminary Injunction**

22    The Federal Rules of Civil Procedure authorize both *ex parte* temporary restraining
23 orders and preliminary injunctions.  FRCP 65(b); LRCiv 65.1.  A TRO may issue based
24 upon a verified complaint or declaration.  *Fox v. Gifford*, 2023 U.S. Dist. LEXIS 26609,
25 *29 (N.D.NY. Feb. 16, 2023) ("a Verified Complaint has the force and effect of an
26 affidavit or declaration") citing *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001).
27 The TRO is appropriately sought *ex parte* and without notice to the registrant for domain
28 name disputes because of the risk the defendant will move the domain name to evade

146297617v4

jurisdiction or relief. *Fornix Holdings LLC v. Unknown Party*, 2022 U.S. Dist. LEXIS 92255, *5-8, 2022 WL 1619041 (D. Az. May 23, 2022).

"The rules of evidence do not apply strictly" and the Court "consider[s] hearsay when ruling on a TRO motion." *Ei Corp. v. Gallant Capital*, 2020 U.S. Dist. LEXIS 124991, *3, 2020 WL 4018929 (D. Nev. Jul. 16, 2020) *quoting Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).

A TRO (with an order to show case as to why preliminary injunction should not issue) may issue on a showing of (1) likely success on the merits, (2) likely irreparable harm, (4) a balance of (legitimate) hardships in favor of the plaintiff and (4) the public interest. *Marlyn Nutraceuticals v. Mucos Pharma*, 571 F.3d 873, 877 (9th Cir. 2009) citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Windermere Holdings v. U.S. Wall Decor*, 2011 U.S. Dist. LEXIS 30451, 2-3 (N.D. Cal. Jan. 14, 2011).

The stronger some factors, the weaker showing required of other factors. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). In fact, injunctive relief is so standard for cybersquatting and other similar claims that the Trademark Modernization Act of 2020 streamlines irreparable injury by presuming it upon a showing of likely success. 15 U.S.C. 1116(a).

B. **Plaintiff's Claims Satisfy the Necessary Showing**

1. **Each Claim is Strong and Likely to Succeed on the Merits**

First, as to the cybersquatting claims, all that is required is that the registrant of a domain "uses a domain name" with a "bad faith intent to profit" from confusing similarity to Plaintiff's mark. 15 U.S.C. § 1125(d)(1)(A); *Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 680 (9th Cir. 2005).

There is no question but that the Defendant registered and is using COMFORT.COM to prey off of Plaintiff's prior rights in the valuable COMFORT.COM mark, its long-established associations with SLEEP NUMBER and its valuable legacy SLEEP COMFORT mark. It is the exact domain and mark that Plaintiff used to drive traffic for over 20 years to its industry-leading mattresses, which consumers had become

-6-

146297617v4

accustomed to by millions of uses, and is akin to the obvious case of confusion when a once-authorized franchisee continues a franchisor's mark. *Kahala Franchising, LLC v. Real Faith, LLC*, 2022 U.S. Dist. LEXIS 91420, *7-8, 2022 WL 1605377 (C.D. Cal. May 20, 2022) ("it is [a] well settled doctrine that a terminated franchisee's continued use of its former franchisor's trademarks, by its very nature, constitutes trademark infringement…[with] likelihood of confusion").

Prototypical cybersquatting uses "pay-per-click advertisements that provide revenue to the domain name owner"[1] or seeks to sell or "auction the domain name"[2] – the Defendant here has done <u>both</u>. And given that even opportunistically registering an active domain name long-belonging to a third party readily constitutes cybersquatting, *Jysk Bed'N Linen v. Dutta-Roy*, 2013 U.S. Dist. LEXIS 190139, *11-15 (N.D. Ge. Oct. 21, 2013) (ByDesignFurniture.com), stealing SLEEP NUMBER's active and subsisting registration is all the more blatant cybersquatting.

<u>Second</u>, stealing a Plaintiff's domain name without authorization and attempting to auction it for $495,000 also readily satisfies the requirements for civil liability for a CFAA claim. *Xianyuan Wang v. Bailin Fang*, 2022 U.S. Dist. LEXIS 235033, *7, 2022 WL 18146304 (D. Az. Dec. 20, 2022) (Injunction granted for CFAA claim based on harm from loss of use of "domain name … because only defendant could access Plaintiff's GoDaddy account" for that domain); *Solutions v. Ahmad Rashid Mohammed*, 2012 U.S. Dist. LEXIS 163033, *6, 2012 WL 5825824 (S.D. Tex. Nov. 15, 2012).[3]

The ULTIMATE LICENSEE used some combination of false information to impersonate, gain online access to Plaintiff's domain registration, and then to take over Plaintiff's Network Solutions domain name registration for WWW.COMFORT.COM and exclude Plaintiff from accessing its own domain registration. Plaintiff's backend

---

[1] *Verizon California Inc. v. OnlineNIC, Inc.*, 2009 U.S. Dist. LEXIS 84235, *31, 2009 WL 2706393 (N.D. Cal. Aug. 25, 2009).
[2] *CrossFit, Inc. v. Jenkins*, 69 F. Supp. 3d 1088, 1105 (D. Col. 2014) (Granting preliminary injunction).
[3] The elements of a CFAA claim are access of a computer without authority to obtain data that causes loss over $5,000. *Id.*

-7-

146297617v4

operations have been prevented, and it has had its valuable property of its longstanding domain name stolen (worth well over Defendant's $495,000 auction price), among other damages. These allegations state a claim under the CFAA and make the necessary prima facie showing of harm. *Id.*; *NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 954, 961 (N.D. Cal. 2014) (claim of unauthorized takeover of online accounts causing loss over $5,000 from inability of plaintiff to access account satisfies at least two bases for liability under CFAA, 18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. § 1030(a)(5)(C)). This extensive harm is set forth in further detail in the next Subsection 2, below.

Finally, for the state law claim of conversion, SLEEP NUMBER is a Minnesota corporation headquartered at all relevant times in Minnesota. Plaintiff notably never registered the domain with GoDaddy so as to agree to any choice of law clause, nor took any steps to aim its activities at Arizona. Thus, as between the two states, Minnesota's conversion law applies to the theft of Plaintiff's COMFORT.COM domain. *CRS Recovery v. Laxton*, 600 F.3d 1138, 1142 (9th Cir. 2010) (choice of law rules apply law of state where plaintiff's conversion injury occurred).

Minnesota holds that "a domain name is property" and "is property for the purposes of protection from conversion." *Sprinkler Warehouse v. Systematic Rain*, 859 N.W.2d 527, 531 (Minn. App., 2015) applying inter alia *Kremen v. Cohen*, 337 F.3d 1024 (9th Cir. 2003). "The elements of common law conversion are: (1) plaintiff holds a property interest; and (2) defendant deprives plaintiff of that interest." *Staffing Specifix v. TempWorks Mgmt. Servs.*, 896 N.W.2d 115, 125 (Minn. App. 2017). SLEEP NUMBER was the registrant of its domain name property COMFORT.COM, and ULTIMATE LICENSEE now possesses that registration and is preventing Plaintiff from its ownership, possession and access. Plaintiff cannot control what is on the consumer-facing side or backend of the domain, and Defendant has further deprived Plaintiff of its rights of ownership and possession by transferring the domain to a different registrar (GODADDY.COM) and a Germany server. This is a classic and strong case of conversion.

While any one claim is enough, Plaintiff is likely to prevail on all three claims.

-8-

146297617v4

### 2. SLEEP NUMBER is Being Irreparably Injured, And the Auction Threatens Even Further Injury, All of Which the Requested Emergency Transfer Stops

Plaintiff seeks recovery through an ultimate judgment, but also is in immediate need of a temporary restraining order requiring the cybersquatted COMFORT.COM domain to be provisionally transferred to Plaintiff to prevent further irreparable harm pending the ultimate resolution of this dispute.

Because the claims involve cybersquatting, which carries a presumption of irreparable harm, the analysis for interim injunctive relief is truncated. The Trademark Modernization Act of 2020 restored the Ninth Circuit's prior presumption of irreparable harm[4] for cybersquatting claims, and courts have followed suit by routinely granting preliminary injunctions upon a showing of likely success. *See, e.g. Futures LLC v. Boyd St. Distro LLC*, 2021 U.S. Dist. LEXIS 204640, *10-11 (C.D. Cal. Nov. 24, 2021) (relying on statutory presumption and granting preliminary injunction); *Cisco Sys. v. Wuhan Wolon Commun. Tech. Co.*, 2021 U.S. Dist. LEXIS 137845, *16-18 (N.D. Cal. Jul. 23, 2021) (same, noting Ninth Circuit's earlier presumption in trademark case reinstituted by Trademark Modernization Act); *Vans, Inc. v. Walmart, Inc.*, 2022 U.S. Dist. LEXIS 95244, *34-37 (C.D. Cal. Mar. 31, 2022) (same); *Pharms. v. Phd Mktg.*, 2021 U.S. Dist. LEXIS 254038, *15-16 (C.D. Cal. Mar. 21, 2021) (same).

Even apart from a presumption, the facts here corroborate the presumption, demonstrating both that irreparable harm is occurring and that it will continue if the requested TRO is not issued provisionally transferring the domain. Three branches of irreparable harm are addressed below:

First, "Plaintiffs suffer irreparable harm through disruption of their business operations [and] damage to their goodwill." *Buffets, Inc. v. LVDC II Inc.*, 2011 U.S. Dist.

---

[4] The Ninth Circuit's presumption was so strong that the Circuit would reverse preliminary injunction denials with instructions to grant injunctive relief with irreparable injury analysis that did nothing more than cite the presumption of irreparable injury. *See, e.g. Brookfield Communs., Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1066 (9th Cir. 1999) (reversing denial and instructing entry of preliminary injunction for domain using competitor's trademark).

-9-

146297617v4

LEXIS 91265, *18, 2011 WL 3664548 (M.D. Fl. Aug. 16, 2011).  Plaintiff's backend and day-to-day operations are being hampered by Defendant's continued possession of the COMFORT.COM domain name registration.  The injury from Defendant's stealing of the registration is compounded by its February 28 switch of servers to Germany, disabling COMFORT.COM's backend.

Unless and until the registration is restored to SLEEP NUMBER so it can essentially plug COMFORT.COM back into its backend, at least the following operations-critical activities are impeded, rendered unusable without significant workaround, or altogether disabled:  (1) delivery communications, (2) scheduling communications, (3) customer rescheduling, (4) employee mobile device functioning, (5) remote trouble shooting of customers' products, (6) remote management of employee workstation applications and operating systems, and (7) VPN access.

Such difficulty supporting SLEEP NUMBER's customer relationships and business operations unquestionably threatens to damage its business goodwill and result in substantial but impossible to calculate damages.  *Buffets, Inc.*, 2011 U.S. Dist. LEXIS 91265, *18 (such showing constitutes showing of irreparable injury).  Even waiting to transfer until a normally-noticed Motion would risk crippling and handicapping for weeks these many and far-flung operations of Plaintiff's $2 billion/year business.  This irreparable injury is multi-faceted here.

Difficulties scheduling deliveries or managing order logistics will mean dissatisfied customers not receiving purchased product, and losing the attendant sleep benefits. *PepsiCo, Inc. v. Los Potros Distrib. Ctr.*, 2008 U.S. Dist. LEXIS 92487, *4, 2008 WL 942283 (D. Az. Apr. 4, 2008) ("dissatisfaction among retailers and customers" shows irreparable harm).  The lost backend prevents troubleshooting for customers' products, meaning customers who already have Plaintiff's smart beds but have an issue will not be able to fix that issue due to lack of remote troubleshooting access.  Both groups face the possibility of interrupted sleep because of Defendant's theft.

A good nights' sleep is the cornerstone of Plaintiff's business, and for good reason.

-10-

146297617v4

1   Per the NIH, sleep deficiencies are well documented as causing a host of health issues and
2   higher chance of injury.  See www.nhlbi.nih.gov/health/sleep-deprivation ("Sleep
3   deficiency can lead to physical and mental health problems, injuries, loss of productivity,
4   and even a greater likelihood of death.")

5         These issues are potentially repeated countless times across a customer base
6   spanning $2 billion/year in sales year in and year out.  That is a large customer base to
7   impair the ability to obtain or remotely repair their products for weeks or months on end
8   while this case plays out.

9         The harm faced by SLEEP NUMBER's customers is a particularized and well-
10  accepted breed of irreparable injury (and supports the public interest factor as well).
11  Specifically, creating a situation where many people (or indeed even one person)
12  "experience unnecessary pain and distress" is sufficient to "demonstrate[] a likelihood of
13  irreparable injury."  *Fisher v. Singer*, 2021 U.S. Dist. LEXIS 195582, *17, 2021 WL
14  4690833 (C.D. Cal. Jul. 14, 2021).  The showing is so clear that it may be clear error not to
15  find irreparable injury from the risk of emotional problems, anxiety, or health problems.
16  *Chalk v. United States Dist. Court Cent. Dist.*, 840 F.2d 701, 709 (9th Cir. 1988) (finding
17  clear error in failing to enjoin the conduct).

18        And the backend issues include difficulties providing Plaintiff's more than 5,000
19  employees appropriate VPN and remote workstation capabilities, threatening a drop in
20  productivity, delays and difficulties, yet another clear demonstration of irreparable injury.
21  *NAPA Pittsburgh, Inc. v. Automotive Chauffeurs*, 363 F. Supp. 54, 58 (W.D. Penn. 1973)
22  (evidence that the "productivity of the company was brought to a screeching halt" showed
23  "the company would suffer irreparable injury" without an injunction).

24        Thus, the interference with backend and day-to-day functions caused by Defendant
25  strongly shows serious irreparable injury absent an immediate provisional transfer order.

26        Second, irreparable harm is shown because the ULTIMATE LICENSEE moved the
27  COMFORT.COM domain to a Germany server and put the domain up for auction,
28  currently through GoDaddy Auctions.  It is well accepted that the "threat to sell the

146297617v4

Infringing Domain to a third party also supports an irreparable-harm finding." *W. Coast Corvettes, Inc. v. MV Mktg., Inc.*, 2012 U.S. Dist. LEXIS 56676, *32, 2012 WL 1401433 (C.D. Cal. Apr. 23, 2012) citing *Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1036-1037 (C.D. Cal. 2010). This risk of irreparable injury is "especially" compelling if the defendant is a foreign entity or using foreign locations to put itself "beyond the effective reach of U.S. courts." *Id.*

<u>Third</u>, leaving the domain name in the hands of a thieving registrant who is cybersquatting on converted property risks irreparable injury, particularly where the Defendant may be foreign, making collection of any money judgment traditionally difficult. As Plaintiff is a $2 billion/year business, harm to Plaintiff stacks up quickly, and the risk of an uncollectible judgment is acute, even if damages could be sufficiently estimated. *In re Focus Media Inc.*, 387 F.3d 1077, 1086-1087 (9th Cir. 2004) (showing "at least a possibility" of dissipation of assets justifies "irreparable injury" sufficient for interim injunction).

Thus, the irreparable harm factor favors the TRO and requested provisional transfer.

### 3. The Balance of Hardships and Public Interest Favor Plaintiff's Relief

The balance of hardships favors the requested TRO. A bad faith cybersquatter "faces no hardship in refraining from willful [] infringement." *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006). The ULTIMATE LICENSEE has converted a domain name that does not belong to it, and now wants to sell the stolen property, but a defendant "will not suffer cognizable hardship" where the injunction will merely stop it "from taking actions that would be unlawful." *Hub Int'l of Cal. Ins. Servs. v. Kilzer*, 2006 U.S. Dist. LEXIS 68491, *10, 2006 WL 2619360 (N.D. Cal. Sept. 12, 2006). Nor is there any harm, because the transfer is provisional and the Court could always remedy any perceived harm by ordering the domain to be transferred back. Thus, in contrast to the pronounced, immediate, and severe irreparable harm to Plaintiff, there is no harm (or legitimate harm) to Defendant from a provisional transfer.

-12-

146297617v4

The public interest also supports the requested TRO.  The public's interest is in avoiding fraud and harm to the public. *See, e.g. SEC v. Bar Works Capital, LLC*, 2017 U.S. Dist. LEXIS 170983 (N.D. Cal. Oct. 16, 2017).  The public benefits from a TRO that ensures customers needing technical support will continue to be serviced by a backend that functions (i.e. when Plaintiff can reinsert the COMFORT.COM domain into its backend).  Many employees, their livelihoods, and childcare arrangements will benefit from preventing further interference with their remote work capabilities and abilities to remotely assist customers – longstanding routines that were suddenly disrupted when Defendant took its domain name hijack to the next level on Tuesday.  Consumers will benefit from once again being redirected to SLEEP NUMBER's website when clicking through to the COMFORT.COM domain Plaintiff has spent decades cultivating.  And "the public has a strong interest in protecting property rights."  *Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt.*, 456 Fed. Appx. 184, 188-189 (3d. Cir. Unpub. Jan. 5, 2012) (conversion claim).  The public interest is served by Plaintiff's requested relief.

### 4. Summary of TRO Relief Warranted and Basis for No or Minimal Bond

All four traditional factors support a TRO.  A TRO should issue providing for the provisional transfer of the COMFORT.COM domain to SLEEP NUMBER.  This provisional transfer relief sought **<u>is regularly granted</u>** in cases involving cybersquatting and wrongful use of domain names, indeed the Lanham Act's statutory language expressly provides for just such transfer relief for counterfeiting claims.[5]  Similarly, on a conversion claim, courts recognize "it would sanction the unlawful possession" of converted property not to grant interim relief returning the property to the Plaintiff.[6]

---

[5] *See, e.g. Rylee & CRU, Inc. v. Hui Zhu*, 2023 U.S. Dist. LEXIS 30371, *9-10, 2023 WL 2187480 (D. Col. Feb. 23, 2023) (ordering interim transfer to plaintiff); *Mirage Resorts, Inc. v. Stirpe,* 152 F. Supp. 2d 1208, 1211 (D. Nev. 2000) (preliminary injunction granted for Lanham Act and cybersquatting violations requiring "transfer [of] ownership of the Domain Names"); *Orchid Labs Incorporate v. Ultimate Licensee*, Dkt. 11, CV-18-00582-PHX-DJH (D. Az. Feb. 22, 2018) (TRO for cybersquatting ordering "domain name [] shall be immediately … transferred to Plaintiff").

[6] *Blockchain LLC v. Blaise Energy Power, Inc.*, 589 F. Supp. 3d 1102, 1114 (N.D. Dk. 2022) (preliminary injunction ordering return of converted cryptocurrency miners upon

-13-

The Registrar GODADDY.COM has indicated it will comply with any transfer order and is simply awaiting an appropriate TRO. "[C]ourts have concluded that nonparty domain name registries and registrars may be enjoined under Rule 65(d)(2)(C)," which include "nonparty domain name registries and registrars." *See, e.g. Dish Network, L.L.C. v. Dima Furniture, Inc.*, 2019 U.S. Dist. LEXIS 101098, *25, 2019 WL 2498224 (D. Md. Jun. 17, 2019) citing FRCP 65(d)(2)(C) ("VeriSign, GoDaddy.com, and Name.com may properly be bound by an injunction under Rule 65(d)(2)(C)"); *TVB Holdings (USA), Inc. v. HTV Int'l Ltd.*, 2018 U.S. Dist. LEXIS 41323, *23-24, 2018 WL 7076022 (E.D.N.Y. Mar. 9, 2018). GODADDY.COM and its affiliates are the Registrar, GoDaddy Auction site, and privacy protect proxy for this domain, and thus GODADDY.COM and DOMAINS BY PROXY can and should be included expressly in a TRO.

And on the issue of a bond, the strong likelihood of success and lack of risk of legitimate harm to Defendant warrants no bond or a minimal bond (i.e. $100). *See Van de Kamp v. Tahoe Regional Plan Planning Agency*, 766 F.2d 1319, 1326 as amended 775 F.3d 998 (9th Cir. 1995) (a strong likelihood of success on the merits "tips in favor of a minimal bond or no bond at all"); *2die4kourt v. Hillair Capital Mgmt., LLC*, 2016 U.S. Dist. LEXIS 118211, *33 (C.D. Cal. Aug. 23, 2016) (quoting *Van de Kamp* and finding no bond required based on strong likelihood of success on merits); *Starcom Mediavest Group, Inc. v. Mediavestw.com*, 2010 U.S. Dist. LEXIS 98201, *3 (N.D. Cal. Sept. 13, 2010) (same; strong showing of likely success of cybersquatting claim justified requiring no bond on TRO); *Color Me House, Inc. v. Discovery Communs., Inc.*, 2013 U.S. Dist. LEXIS 44234, at *27 ($1,000 bond in light of "strong likelihood of success on the merits" among other considerations);

---

showing of likely success: "To do otherwise would be to sanction the unlawful possession of the miners when the Defendants have presented no valid justification for maintaining possession over them."); *Sixth Angel Shepherd Rescue, Inc. v. Bengal*, 2010 U.S. Dist. LEXIS 53472, *11-13, 2010 WL 2164521 (E.D. Penn. May 27, 2010) (granting usual TRO remedy for converted property, return of the personal property); *see also Bancroft Life & Cas. ICC, Ltd. v. Intercontinental Mgmt.*, 456 Fed. Appx. 184, 188-189 (3d. Cir. Unpub. Jan. 5, 2012) (affirming preliminary injunction ordering "returning Bancroft's books and records" upon showing they were converted, including because "public has a strong interest in protecting property rights").

-14-

## C. Related Relief of Service by Email or Transmission Through Privacy Proxy

Given that the Ultimate Licensee has used DOMAINS BY PROXY privacy protect proxy service to conceal its identity, and the privacy protect system does permit communications to be routed to Defendant Ultimate Licensee, Plaintiff also seeks an order permitting service of the Complaint and all other documents in this case via electronic contract procedure of the privacy protect system (to be replaced by any actual email of Ultimate Licensee once obtained). The proxy email which routes emails to ULTIMATE LICENSEE's email is complaint.com@domainsbyproxy.com. *See* Wagner Declaration.

The Court should authorize service of process in this case (including for Summons and Complaint) by means of email or through the privacy protection proxy service for contacting registrants, as both are means of service most reasonably calculated to provide actual notice to the Defendant ULTIMATE LICENSEE pursuant to FRCP 4(e)(1). *Mode Media Corp. v. Doe*, 2016 U.S. Dist. LEXIS 5493, *7 (N.D. Cal. Jan. 15, 2016) (where registrant used "privacy protection proxy service," "service via the proxy service is reasonably calculated to effect service"; authorizing service for TRO and Complaint via proxy service); *Entrepreneur Media, Inc. v. Doe*, 2019 U.S. Dist. LEXIS 230851, *3-4 (C.D. Cal. Dec. 5, 2019) (collecting cases authorizing email service on both foreign and domestic parties).

This is the method that Defendant agreed to for this domain, so certainly it is reasonably calculated to provide actual and fair notice. *Sport Lisboa e Benfica-Futebol, SAD v. Doe*, 2018 U.S. Dist. LEXIS 142971, *6-8, 2018 WL 4043182 (C.D. Cal. Aug. 21, 2018) (collecting cases authorizing such service where email means of communication was provided by registrant). The Proposed Order lists proposed appropriate terms.

146297617v4

| | |
|---|---|
| Dated: March 3, 2023 | Respectfully Submitted,<br><br>TROUTMAN PEPPER HAMILTON SANDERS LLP<br><br><br>By: s/*Justin D. Balser*<br>   Justin D. Balser<br>   Ben L. Wagner<br>   Attorneys for Plaintiff<br>   SLEEP NUMBER CORP. |

TROUTMAN PEPPER HAMILTON SANDERS LLP
11682 EL CAMINO REAL
SUITE 400
SAN DIEGO, CA 92130

-16-

146297617v4